James E. Cecchi
CARELLA, BYRNE, CECCHI,
  OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: 973/994-1700

Samuel H. Rudman
Mary K. Blasy
ROBBINS GELLER RUDMAN
  & DOWD LLP
58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100

Attorneys for Plaintiff

[Additional counsel appear on signature page.]

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| IVAN I. AGUILAR, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> VITAMIN SHOPPE, INC., RICHARD L. MARKEE, COLIN F. WATTS and BRENDA M. GALGANO, <br><br> Defendants. | Civil Action No. 17-6454(KM)(MAH) <br><br><br> **CORRECTED COMPLAINT** <br> **and** <br> <u>**DEMAND FOR JURY TRIAL**</u> |

Plaintiff Ivan I. Aguilar ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Vitamin Shoppe, Inc. ("Vitamin Shoppe" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company,

and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of purchasers of Vitamin Shoppe common stock between March 1, 2017 and August 8, 2017, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.     Defendant Vitamin Shoppe operates as a specialty retailer and direct marketer of nutritional products in the United States.  The Company's common stock was taken public in an initial public offering ("IPO") in 2009, and it was a growth story for the next six years as more people became obsessed with fitness, weight loss, herbal cleanses and vitamin supplements.

3.     However, retail sales at Vitamin Shoppe and its biggest competitor, GNC Holdings, Inc. ("GNC") whose stock was also taken public in 2011, have been stunted since 2015 by competition from online and big-box retailers such as Amazon, Wal-Mart, Costco and Target.  Since 2015, Vitamin Shoppe had been plagued by declining same-store sales, a weakening outlook and many analysts downgrading the stock.

4.     Under pressure from its controlling shareholder Carlson Capital, Vitamin Shoppe announced on March 3, 2015 that Colin F. Watts ("Watts") had joined as Chief Executive Officer ("CEO") effective April 6, 2015, succeeding the CEO who had served since the IPO.  Then in January 2016, the Company disclosed that Richard L. Markee ("Markee") who had served as Executive Chairman of the Vitamin Shoppe Board of Directors since its IPO would no longer remain employed by the Company, though he would continue on as the Non-Executive Chairman of the Board.  By June 2016, however, Vitamin Shoppe would announce that another director had assumed the role of Non-Executive Chairman, but that defendant Markee would remain a Director.  Finally,

on February 21, 2017, the Company announced that the Board would be expanded by two more members, one designated by Carlson Capital.

5. Meanwhile, during the second half of fiscal 2016, Vitamin Shoppe began undertaking what it referred to as "reinvention initiatives." This involved a series of cost-cutting efforts and a major revamping of retail sales all designed to "pave the way for sustainable earnings growth." As explained by defendant Watts on the November 6, 2016 third quarter 2016 earnings conference call, "[t]his process will bring greater rigor to how we plan with our vendor partners, forecast our business and leverage our unique competitive advantage of a network of company owned and operated retail stores and online e-commerce channel for stronger operating performance." According to Watts, "the scope of [the] reinvention plan" included "[o]ne, a commitment to unlock new strategies to drive margin improvement and cost savings; two, a more innovative approach to driving product solutions and value for . . . customers both through third-party brands and [Vitamin Shoppe's] own private brands; and three, progress towards a significant transformation of [its] customer experience both online and in-store."

6. During the Class Period, Defendants issued materially false and misleading statements regarding the purported then-ongoing improvements being achieved, the Company's profitability trends and its financial results. Specifically, on March 1, 2017, Defendants announced fiscal year 2016 ("FY16") results and fiscal year 2017 ("FY17") guidance and represented that despite anticipated flat to single-digit declines in same store sales during FY17, due to the "reinvention plan" then underway, Vitamin Shoppe was on track to deliver "[f]ully diluted earnings per share [EPS] in the range of $1.95 - $2.20" during FY17. Unbeknownst to investors though, Defendants had improperly delayed recognizing a $168 million impairment charge to the carrying value of the Company's retail sector, related goodwill. As a consequence, Vitamin Shoppe's income

and assets were materially overstated during the first and second fiscal quarters of 2017, and its financial results were not presented in conformity with Generally Accepted Accounting Principles ("GAAP").  With the price of Vitamin Shoppe common stock artificially-inflated on these misstatements, certain of the Company's top officers and directors cashed in immediately between March 2nd and March 7th selling $2.4 million in shares, including Defendant Markee, who alone sold 100,000 shares on March 2, 2017 for more than $2.22 million.

7.    On May 10, 2017, Vitamin Shoppe announced financial results for the Company's first quarter 2017 ("1Q17") and lowered FY17 guidance.  Vitamin Shoppe reported "GAAP fully diluted earnings per share of $0.35" for the 1Q17 and slashed FY17 guidance by more than 45% to "GAAP fully diluted earnings per share in the range of $1.03 - $1.28" for FY17.  In an attempt to mollify investors by reassuring them that the reinvention plan was indeed succeeding, in order to prevent a free-fall in the price of Vitamin Shoppe common stock, Defendant Watts represented that "[w]hile the start of the year ha[d] been challenging, [defendants were] encouraged by the progress [they had] made on [the] major reinvention and cost reduction initiatives that [they] began developing and piloting over the last several months," and that "[c]ustomer response to . . . pilots ha[d] given [them] confidence that these new initiatives should have a positive impact on [its] business trends starting in the back half of this year."

8.    Nonetheless, in response to the unexpected dramatic 45% reduction in FY17 EPS guidance, the price of Vitamin Shoppe stock declined by one-third on May 10th, falling more than $6 per share to close at $12.70 per share on extremely heavy trading volume of more than 4.3 million shares trading, or more than 18 times the average daily volume over the preceding ten trading days.

9.    Then on August 9, 2017, Vitamin Shoppe again shocked the market announcing that it was taking a $168 million impairment charge on the goodwill being carried on its books for its retail segment, and that as a result, Vitamin Shoppe would report a "GAAP *loss per share of $6.73*" in its second quarter 2017 ("2Q17"). And suddenly, citing "the potential increase in variability of the Company's results *due to the number of initiatives being launched in the back half of the year*," Vitamin Shoppe dropped FY17 EPS guidance altogether.[1]

10.    The price of Vitamin Shoppe common stock plunged further on this news, falling $3.50 per share to close at $6.10 per share, on unusually high trading volume of more than 5.1 million shares trading.

## PARTIES

11.    Plaintiff Ivan I. Aguilar is a citizen of New Jersey, residing in Woodland Park, New Jersey. As set forth in the accompanying certification and incorporated by reference herein, Plaintiff purchased the common stock of Vitamin Shoppe during the Class Period and has been damaged thereby.

12.    Defendant Vitamin Shoppe, through its subsidiaries, operates as a specialty retailer and direct marketer of nutritional products in the United States. Originally founded in 1977 as VS Holdings, Inc. before changing its name to Vitamin Shoppe, Inc. in November 2009, the Company is headquartered in North Bergen, New Jersey.

13.    Defendant Richard L. Markee ("Markee") served as a Director of Vitamin Shoppe between the start of the Class Period until June 7, 2017. Previously, he had served as Vitamin Shoppe's CEO from September 2009 through April 2011 and as the Chairman of its Board from September 2009 through January 2016.

---

[1]    Emphasis is added unless otherwise noted.

14.     Defendant Colin F. Watts ("Watts") served as CEO and a Director of Vitamin Shoppe throughout the Class Period.

15.     Defendant Brenda M. Galgano ("Galgano") served as Executive Vice President and the Chief Financial Officer ("CFO") of Vitamin Shoppe during the Class Period.

16.     Defendants Markee, Watts and Galgano are referred to herein as the Individual Defendants.

17.     Defendants are liable for: (i) making false statements; or (ii) failing to disclose adverse facts known to them about Vitamin Shoppe.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Vitamin Shoppe stock was a success, as it: (i) deceived the investing public regarding Vitamin Shoppe's prospects and business; (ii) artificially inflated the price of Vitamin Shoppe common stock; (iii) enabled certain Vitamin Shoppe insiders to sell millions of dollars of their personally-held Vitamin Shoppe common stock to the unsuspecting public; and (iv) caused plaintiff and other members of the Class to purchase Vitamin Shoppe common stock at artificially inflated prices.

## JURISDICTION AND VENUE

18.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

19.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act [15 U.S.C. §78aa].

20.     Venue is proper in this District pursuant to §27 of the Exchange Act, and 28 U.S.C. §1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

21.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## SUBSTANTIVE ALLEGATIONS

22.     Defendant Vitamin Shoppe is a multi-channel specialty retailer and contract manufacturer of nutritional products based in Secaucus, New Jersey.  In its stores and on its websites, the Company carries an assortment of vitamins, minerals, specialty supplements, herbs, sports nutrition, homeopathic remedies, green living products, and beauty aids.  In addition to offering products from approximately 850 national brands, the Vitamin Shoppe also carries products under The Vitamin Shoppe®, BodyTech®, True Athlete®, MyTrition®, plnt™, ProBioCare™, Next Step™, Betancourt Nutrition and Nutri-Force Sports® brands.  The Vitamin Shoppe conducts business through more than 700 company-operated retail stores under The Vitamin Shoppe, Super Supplements and Vitapath retail banners, and primarily through its website.

23.     During the Class Period, defendants represented that Vitamin Shoppe's financial statements were prepared in conformity with GAAP.  These representations were materially false and misleading when made because defendants, in violation of GAAP, knowingly or recklessly delayed the recognition of a goodwill impairment charge of more than $168 million for Vitamin Shoppe's retail segment, thereby materially inflating the Company's income and assets during the Class Period.

24.     GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time.  As set forth in Financial Accounting Standards Board ("FASB") Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it

provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

25.    Indeed, compliance with GAAP is a basic fundamental obligation of publicly traded companies. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. §210.4-01(a)(1).

26.    Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. During the Class Period, companies accounted for their business combinations using the purchase method of accounting as set forth in FASB No. 141, Business Combinations. Under the purchase method of accounting, the assets acquired and liabilities assumed are initially recorded at their respective fair market value as of the date of the acquisition. The excess of the purchase price over the fair value of the net assets acquired is recognized and reported as goodwill, which is an asset representing the future economic benefits acquired in a business combination that are not individually identified and separately recognized. In essence, goodwill reflects the going concern value of the business acquired and its expected contribution to combined enterprise's future earnings growth. *See, e.g.*, SFAS No. 141 ¶¶101-14.

27.    During the Class Period, companies were required to account for their goodwill in accordance with SFAS No. 142, Goodwill and Other Intangible Assets. SFAS No. 142 requires that a company review its goodwill to determine if its reported value is impaired. The value of goodwill is impaired when the carrying, or reported, amount of goodwill exceeds its fair value. GAAP

requires that goodwill be tested for impairment at least annually, and more often when events or circumstances arise indicating the goodwill could be impaired. *See, e.g.*, SFAS No. 142 ¶¶18-29.

28.  Testing for goodwill impairment is a two-step process. The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment. In the first step, a company will compare the fair value of a reporting unit to its carrying value. If the fair value of the unit exceeds its carrying amount, then goodwill is deemed to not be impaired and no further testing is required. However, if the carrying value of the unit exceeds its fair value, then a second step is performed to measure the amount of the impairment. Companies are required to perform goodwill testing at the so-called reporting unit level. *See, e.g.*, SFAS No. 142 ¶¶17-22.

29.  The Class Period starts on March 1, 2017. On that date, before the opening of trading, Vitamin Shoppe issued a press release announcing its financial results for the Company's fourth quarter 2016 ("4Q16") and FY16, the period ended December 31, 2016. For the 4Q16, the Company reported "[t]otal net sales [of] $304.9 million, up 3.9% with the same period of the prior year," and a "fully diluted loss per share [of] $0.49, compared to fully diluted earnings per share of $0.22 in fourth quarter 2015." The release stated that as of December 31, 2016, the Company had more than $210.6 million in goodwill. The release also provided FY17 guidance of "[t]otal comparable sales growth of flat to low single digit negative," with "[f]ully diluted earnings per share in the range of $1.95 - $2.20." To support the high FY17 EPS guidance being provided despite the anticipated continued flat to declining sales, the release quoted Defendant Watts stating, in pertinent part, as follows:

> Our top line growth is not yet where we want it to be as fourth quarter comparable sales were disappointing, but generally in line with our expectations. Although the external environment was more difficult than we planned coming into 2016, *we made significant progress in rolling out initiatives tied to our reinvention strategy*.

While we are encouraged by the early results of these programs in 2016, we acknowledge that they will still take time to reach full scale. ***In addition to good progress on growth initiatives during the quarter, we were particularly pleased with accelerated progress in our cost reduction and margin enhancement initiatives, which are vital to building a stronger Return on Capital profile for our Company in 2017***. We still have a ways to go to realize our full Reinvention vision, ***but we remain bullish about our long-term prospects for sustainable, profitable growth***.

30.     That same day, Vitamin Shoppe held a conference call for analysts and investors to discuss the Company's ongoing operations and financial prospects. During the call, Defendants spoke positively about the successes being achieved in the ongoing reinvention plan and the Company's businesses and prospects. Defendant Watts opened his remarks promising a "more in-depth update on the progress we have made on our company reinvention strategy, giving some early indications of what we expect to see on key initiatives for 2017." Later in the call, discussing ongoing cost-cutting efforts being made and the Company's resulting purported return to profitability, Defendant Watts stated, in pertinent part, as follows:

Finally, I'll let Brenda update you on the work that the team delivered in cost savings and improved margin opportunities over the past few months, ***which will begin to be reflected in our profit performance later in 2017***. This work not only will improve the overall margin profile for the Vitamin Shoppe in the future, but it has allowed us to make important investments in improving our value proposition to our customers.

***12 months into our reinvention strategy, we've made very good progress to-date. We are confident that our company is well positioned to grow profitably and to increase shareholder value by the back-half of 2017.***

31.     During her opening remarks on the conference call, Defendant Galgano continued providing the update on Vitamin Shoppe's purported ongoing return to profitability, stating, in pertinent part, as follows:

On the last call, we had discussed that we had identified $22.5 million in total cumulative annualized savings from initiatives starting in the middle of 2015. Based on additional work that we have undertaken, including deep analytics around cost of goods sold, we have identified an additional $14 million of annualized savings bringing the total savings to $36.5 million. These additional savings are mainly

expected to be generated from the work we are doing around vendor partnerships and more efficient pricing and promotion.

As expected, the impact and benefits related to these efficiency initiatives was modest in 2016 as we invested approximately $9 million in the business tied to our reinvention plan.  Of the total $36.5 million in total savings, more than $25 million relates to the cost of goods sold reductions, most of which has not yet been realized in our P&L.  ***These savings are expected to ramp up during 2017 as the inventory is sold through.***

***Overall, we expect the year-over-year increase in cost reduction to be approximately $17 million, which will help to bridge expected weaker top-line comps during the front half of 2017 and allow us to make investment to support longer-term growth.***

An additional approximate $10 million of savings is expected beyond 2017 as we realize the full annualized benefit from these initiatives.  And we will continue to work to identify further opportunities.  This is a key focus for the company.  ***We are pleased with the significant progress made and you can expect to see these benefits in our results as the year progresses.***

We are focused on permanently building a cost structure that improves our point of leverage which has historically been at the 3.5% or more comp range.  ***With actions we have taken, including all of our processes and key initiatives and reduction in new store growth, we believe we can begin to leverage cost with a sales comp closer to 2.5%.***

32.     On March 1, 2017, Vitamin Shoppe filed its Form 10-K with the SEC, which was signed by each of the Individual Defendants and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Watts and Galgano (the "2016 10-K").  The 2016 10-K stated that the Company's audited financial statements had been prepared in accordance with GAAP and that it had more than $210.6 million in goodwill.  Elsewhere, the 2016 10-K stated that "[t]he Company currently operate[d] three business segments, retail, direct and manufacturing," and that  "[t]he Company ha[d] ***allocated $165.3 million*** and $45.3 million of its recorded goodwill to ***the retail*** and direct ***segments, respectively***."  Concerning Vitamin Shoppe's accounting for its goodwill, the 2016 10-K stated, in pertinent part, as follows:

**Goodwill and Other Intangible Assets.** On an annual basis, *or whenever impairment indicators exist*, we perform an evaluation of goodwill and indefinite-lived intangible assets. In the absence of any impairment indicators, goodwill and other indefinite-lived intangible assets are tested in the fourth quarter of each fiscal year. With regards to goodwill, our evaluations are based on our three reporting units. The evaluations of goodwill and indefinite-lived intangible assets may first consider qualitative factors to determine whether the existence of events or circumstances leads to a determination that it is more likely than not that the fair value of a reporting unit or indefinite-lived intangible asset is less than its carrying value. A quantitative evaluation is performed if the qualitative evaluation results in a more likely than not determination or if a qualitative evaluation is not performed. Our quantitative evaluation for goodwill utilizes the discounted cash flow method, based on operating projections, as well as the market multiples method. For indefinite-lived tradenames, we utilize the royalty relief method in our quantitative evaluations. For those intangible assets which have definite lives, we amortize their cost on a straight-line basis over their estimated useful lives, the periods of which vary based on their particular contractual terms.

Our annual impairment review requires extensive use of accounting judgment and financial estimates. Judgments regarding the existence of impairment indicators are based on market conditions and operational performance of the business. Future events could cause us to conclude that impairment indicators exist, and therefore that goodwill and other intangible assets may be impaired. *The valuation of goodwill and indefinite-lived intangible assets is affected by, among other things, our business plan for the future and estimated results of future operations. Changes in the business plan, operating results, or application of alternative assumptions that are different than the estimates used to develop the valuation of the assets may materially impact their valuation.*

In Fiscal 2016, the Company performed a quantitative analysis of its retail and direct reporting units and determined that the fair value of these reporting units was greater that their respective carrying values. As a result, *the Company believes the fair values of each of these reporting units and indefinite-lived tradenames substantially exceeds their respective carrying values*.

33.    On this news, the price of Vitamin Shoppe's stock rose more than 8% from its close of $21.30 on February 28th in intraday trading, reaching a Class Period high of $23.25 per share on March 1, 2017.

34.    Several of Vitamin Shoppe's senior executives and directors immediately cashed-in, selling approximately $2.4 million of their personally-held Vitamin Shoppe stock at fraud-inflated

prices, including Defendant Markee who sold 100,000 shares on March 3, 2017 alone for $2,224,000 in gross proceeds.

35.     On May 10, 2017, Vitamin Shoppe announced its 1Q17 financial results.  Vitamin Shoppe reported "GAAP fully diluted earnings per share of $0.35" for the 1Q17 and slashed its FY17 guidance by more than 45% to "GAAP fully diluted earnings per share in the range of $1.03 - $1.28."  The release stated that as of April 1, 2017, the Company still had more than $210.6 million in goodwill being carried on its books.  In an attempt to reassure investors that Vitamin Shoppe's reinvention plan was still proceeding successfully in order to prevent a free-fall in the price of Vitamin Shoppe common stock, the release quoted Defendant Watts emphasizing that "[w]hile the start of the year ha[d] been challenging, I am encouraged by the progress we have made on our major reinvention and cost reduction initiatives that we began developing and piloting over the last several months," and that "[c]ustomer response to our pilots has given us confidence that these new initiatives should have a positive impact on our business trends starting in the back half of this year."

36.     During the conference call held with investors later that day, Defendant Watts acknowledged that Vitamin Shoppe was "disappointed by [its] Q1 results and [that] Q2 [was] shaping up to be another difficult quarter," but he again emphatically reassured investors that the Company had fully "adjusted [its] guidance to reflect this."  During her opening remarks, Defendant Galgano again assured investors the Company was returning to profitability, stating, in pertinent part, as follows:

> Now, a few more comments about our cost savings initiatives.  As previously discussed, we have identified $36.5 million in total cumulative, annualized savings from initiatives that began over a year ago. *As I noted, some of these savings are already positively impacting our P&L, but we expect more to come*.  Of the $36.5 million in savings, $25.5 million is expected to be generated from the workaround vendor partnerships and more efficient pricing and promotion spending, *which is planned to ramp up as we move through the year*.

By the fourth quarter, we expect the cost of goods sold savings to positively contribute over 150 basis points to gross margin.  This would represent an improvement of over 100 basis points above the first quarter run rate.  For the year, as a whole, we expect to realize cost of goods sold savings of $15 million and SG&A savings of $11 million, netting to $17 million after investments for growth.

37.    During the conference call, Defendant Galgano also now provided specific 2Q17 guidance, stating, in pertinent part, as follows:

As we look to the current quarter and consider the costs associated with the Nutri-Force turnaround as well as the elevated competitive environment, ***we thought it would be helpful to provide some additional guidance.  We currently estimate that the second quarter GAAP EPS will be in the range of a loss of $0.07 to earnings of $0.03 a share.***

38.    Nonetheless, in response to the unexpected 45% reduction in FY17 EPS guidance, the price of Vitamin Shoppe stock declined by one-third on May 10th, more than $6 per share, to close at $12.70 per share, on extremely heavy trading volume of more than 4.3 million shares trading, or more than 18 times the average daily volume over the preceding ten trading days.

39.    On May 10, 2017, Vitamin Shoppe filed its Form 10-Q with the SEC, which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by Defendants Watts and Galgano (the "1Q17 10-Q").  The 1Q17 10-Q stated that the Company still had more than $210.6 million in goodwill on its books as of April 1, 2017, ***but now stated all "$210.6 million of its recorded goodwill" was suddenly being "allocated" "to the retail segment."***  This effectively increased the retail segment's goodwill by more than $45 million – ***for no apparent reason***.  The 1Q17 10-Q further stated that the "interim financial statements reflect all adjustments, which [were], in the opinion of management, necessary for a fair presentation in conformity with GAAP" and that they "should be read in conjunction with the audited financial statements and notes thereto included in the Form 10-K for the fiscal year ended December 31, 2016, as filed with the Securities and Exchange Commission on March 1, 2017."

40.     The statements in ¶¶29-32, 35-37 and 39 were each materially false and misleading because they failed to disclose the following adverse facts which were known to defendants or recklessly disregarded by them:

(a)     that the Company's retail segment was continuing to dramatically decline and the "reinvention plan" was not meeting with success;

(b)     that ongoing changes to the Company's operating plan brought about through the "reinvention plan" had already rendered the more than $168 million in goodwill being carried on Vitamin Shoppe's books for the retail segment impaired;

(c)     that Vitamin Shoppe was improperly delaying recognizing a $168 million impairment charge to the value of the retail segment's goodwill, and as a result, its reported income and assets were materially overstated and the Company's financial results were not prepared in conformity with GAAP;

(d)     that the value of the goodwill being attributed to the retail segment did not increase by more than $45 million during the 1Q17; and

(e)     as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the success of Vitamin Shoppe's reinvention plan and financial prospects, including the viability of its return to profitability during FY17.

41.     On August 9, 2017, Vitamin Shoppe shocked the market by announcing that it was taking a $168.1 million impairment charge on the goodwill being carried on its books associated with its retail segment, and that as a result, Vitamin Shoppe would report a "GAAP *loss per share of $6.73*" in its 2Q17.  Citing "the potential increase in variability of the Company's results *due to the number of initiatives being launched in the back half of the year*," Vitamin Shoppe also dropped its FY17 EPS guidance altogether.

42.    The price of Vitamin Shoppe common stock plunged again on this news, falling $3.50 per share to close at $6.10 per share on unusually high trading volume of more than 5.1 million shares trading.

43.    The market for Vitamin Shoppe common stock was open, well-developed and efficient at all relevant times.  As a result of these materially false and misleading statements and failures to disclose, Vitamin Shoppe common stock traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Vitamin Shoppe common stock relying upon the integrity of the market price of Vitamin Shoppe common stock and market information relating to Vitamin Shoppe, and have been damaged thereby.

44.    During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Vitamin Shoppe common stock by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

45.    At all relevant times, the material misrepresentations and omissions particularized in this complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about Vitamin Shoppe's business, prospects and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of Vitamin Shoppe and its business, prospects and operations, thus causing the price of Vitamin Shoppe common stock to be overvalued and artificially inflated at all relevant

times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing Vitamin Shoppe common stock at artificially inflated prices, thus causing the damages complained of herein.  When the true facts about the Company were revealed to the market the inflation in the price of Vitamin Shoppe stock was removed and the price of Vitamin Shoppe stock declined dramatically causing loss to Plaintiff and the other members of the Class.

46.     As a result of Defendants' false statements, Vitamin Shoppe common stock traded at artificially inflated levels during the Class Period.  After the above revelations seeped into the market, the price of Vitamin Shoppe common stock was hammered by massive sales, sending them down approximately 75% from their Class Period high of $23.25 per share on March 1, 2017.

## ADDITIONAL SCIENTER ALLEGATIONS

47.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Vitamin Shoppe, their control over, and/or receipt and/or modification of Vitamin Shoppe's allegedly materially misleading misstatements and/or their associations with the Company, which made them privy to confidential proprietary information concerning Vitamin Shoppe, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

48.    At all relevant times, the market for Vitamin Shoppe common stock was an efficient market for the following reasons, among others:

(a)    Vitamin Shoppe stock met the requirements for listing, and was listed and actively traded on the New York Stock Exchange ("NYSE"), a highly efficient and automated market;

(b)    According to the 2Q17 10-Q, the Company had more than 23.7 million shares outstanding as of July 21, 2017.  During the Class Period, on average, more than 500,000 shares of Vitamin Shoppe stock were traded on a daily basis, demonstrating a very active and broad market for Vitamin Shoppe stock and permitting a very strong presumption of an efficient market;

(c)    Vitamin Shoppe claims to be qualified to file a less comprehensive Form S-3 registration statement with the SEC that is reserved, by definition, to well-established and largely capitalized issuers for whom less scrutiny is required;

(d)    as a regulated issuer, Vitamin Shoppe filed periodic public reports with the SEC and the NYSE;

(e)    Vitamin Shoppe regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(f)    Vitamin Shoppe was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

49.     As a result of the foregoing, the market for Vitamin Shoppe common stock promptly digested current information regarding Vitamin Shoppe from all publicly available sources and reflected such information in the price of Vitamin Shoppe common stock .   Under these circumstances, all purchasers of Vitamin Shoppe common stock during the Class Period suffered similar injury through their purchase of Vitamin Shoppe common stock at artificially inflated prices and a presumption of reliance applies.

## NO SAFE HARBOR

50.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Vitamin Shoppe who knew that those statements were false when made.

## CLASS ACTION ALLEGATIONS

51.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common stock of Vitamin Shoppe during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant

times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

52.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Vitamin Shoppe shares were actively traded on the NYSE.  While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Vitamin Shoppe or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

53.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

54.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

55.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by defendants' acts as alleged herein;

(b)    whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Vitamin Shoppe; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

56.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**<u>COUNT I</u>**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

57.     Plaintiff incorporates ¶¶1-56 by reference as if fully set forth herein.

58.     During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

59.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Vitamin Shoppe common stock during the Class Period.

60.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Vitamin Shoppe common stock.  Plaintiff and the Class would not have purchased Vitamin Shoppe common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

61.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Vitamin Shoppe common stock during the Class Period.

**COUNT II**
**Violation of Section 20(a) of the Exchange Act**
**Against All Defendants**

62.     Plaintiff incorporates ¶¶1-61 by reference as if fully set forth herein.

63.     The Individual Defendants acted as controlling persons of Vitamin Shoppe within the meaning of §20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Vitamin Shoppe, and their ownership of Vitamin Shoppe stock, the Individual Defendants had the power and authority to cause Vitamin Shoppe to engage in the wrongful conduct complained of herein.  Vitamin Shoppe controlled each of the Individual Defendants and all of its employees.  By reason of such conduct, the Individual Defendants and Vitamin Shoppe are liable pursuant to §20(a) of the Exchange Act.

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  August 30, 2017                    CARELLA, BYRNE, CECCHI,
                                              OLSTEIN, BRODY & AGNELLO, P.C.
                                           JAMES E. CECCHI


                                           _____
                                                  /s/ James E. Cecchi
                                                  JAMES E. CECCHI
                                           5 Becker Farm Road
                                           Roseland, NJ  07068
                                           Telephone:  973/994-1700
                                           973-994-1744 (fax)
                                           JCecchi@carellabyrne.com

                                           Samuel H. Rudman
                                           Mary K. Blasy
                                           ROBBINS GELLER RUDMAN
                                              & DOWD LLP
                                           58 South Service Road, Suite 200
                                           Melville, NY  11747
                                           Telephone:  631/367-7100
                                           631/367-1173 (fax)
                                           srudman@rgrdlaw.com
                                           mblasy@rgrdlaw.com

                                           Frank J. Johnson
                                           JOHNSON & WEAVER, LLP
                                           600 West Broadway, Suite 1540
                                           San Diego, CA  92101
                                           Telephone:  619/230-0063
                                           619/255-1856 (fax)

Michael I. Fistel, Jr.
JOHNSON & WEAVER, LLP
40 Powder Springs Street
Marietta, GA  30064
Telephone:  770/200-3104
770/200-3101 (fax)

*Attorneys for Plaintiff*

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Ivan I Aguilar, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.    I have reviewed the complaint with my counsel and authorize its filing.

2.    I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.    I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.    I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 7/25/2017 | 4800 | 10.50 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| 8/9/2017 | 4800 | 6.50 |

5.    I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6. I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 22nd day of August, 2017.

DocuSigned by:

*Ivan I Aguilar*

147700CD148A4D4...

Ivan I Aguilar