## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| IVAN I. AGUILAR, *individually and on behalf of all others similarly situated*,<br><br>Plaintiff,<br><br>vs.<br><br>VITAMIN SHOPPE, INC., RICHARD L. MARKEE, COLIN F. WATTS, and BRENDA M. GALGANO,<br><br>Defendants. | Civ. No. 2:17-cv-6454-KM-MAH<br><br>**OPINION** |

**KEVIN MCNULTY, U.S.D.J.:**

Before the court in this putative federal securities class action are the competing motions of:

(1) a group of individual plaintiffs consisting of Richard Schubert, Daniel E. Onishuk, Jr., and Mohammed Kayyal (collectively, the "SOK plaintiffs") (ECF No. 4); and

(2) plaintiff Corpus Christi Firefighters' Retirement System ("CCFRS") (ECF No. 5).

Each seeks appointment as lead plaintiff and appointment of its counsel as lead counsel.

## I.   BACKGROUND AND ALLEGATIONS[1]

The underlying federal securities class action is brought on behalf of purchasers of Vitamin Shoppe, Inc. ("Vitamin Shoppe") common stock between March 1, 2017 and August 8, 2017, inclusive (the "Class Period"). The plaintiffs allege violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4, *et seq.*, and of the Securities and Exchange Commission (the "SEC") Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5.

Defendant Vitamin Shoppe is a specialty retailer and direct marketer of nutritional products. (CC ¶¶ 2, 22). Its common stock was taken public in an initial public offering ("IPO") in 2009. (CC ¶ 2). Defendant Richard L. Markee ("Markee") served as a Director of Vitamin Shoppe from the start of the Class Period until June 7, 2017. (CC ¶ 13). He previously served as the CEO and Chairman of the Board. (CC ¶ 13). Defendant Colin F. Watts ("Watts") served as the CEO and a Director of Vitamin Shoppe throughout the class period. (CC ¶ 14). Defendant Brenda M. Galgano ("Galgano") served as Executive Vice President and the Chief Financial Officer ("CFO") of Vitamin Shoppe during the Class Period. (CC ¶ 15).

Named plaintiff Ivan I. Aguilar, on behalf of the putative class, alleges that from March 1, 2017 to August 8, 2017 Vitamin Shoppe issued materially false statements and failed to disclose adverse facts known about Vitamin Shoppe. (CC ¶¶ 1, 11-17). More specifically, plaintiffs allege that defendants

---

[1]   Certain citations to the record are abbreviated as follows:

CC = Corrected Complaint (ECF No. 3)

SOK Motion = Memorandum of Law in Support of Richard Schubert, Daniel E. Onishuk, Jr. and Mohammed Kayyal's Motion for Appointment as Lead Plaintiff and Approval of Counsel (ECF No. 4)

CCFRS Motion = Memorandum of Law in Support of the Motion of Corpus Christi Firefighter's Retirement System for Appointment as Lead Plaintiff and Approval of Selection of Counsel (ECF No. 5-1)

represented that Vitamin Shoppe's financial statements were prepared in conformity with Generally Accepted Accounting Principles ("GAAP"). (CC ¶¶ 23-25). Plaintiff alleges that these representations were materially false because, in violation of GAAP, defendants allegedly delayed the recognition of a goodwill impairment charge of more than $168 million for Vitamin Shoppe's retail segment, thereby inflating the company's income and assets during the class period. (CC ¶¶ 23-28).

### A. March 1, 2017 Press Release

The Class Period starts on March 1, 2017. (CC ¶¶ 29). On that date, before the opening of trading, Vitamin Shoppe issued a press release announcing its financial results for the fourth quarter of 2016, the period that ended December 31, 2016. (CC ¶ 29). The press release reported $304.9 million total net sales, up 3.9% from the same period of the prior year, and a "fully diluted loss per share [of] $0.49, compared to fully diluted earnings per share of $0.22 in fourth quarter 2015." (CC ¶ 29). The release stated that the company had more than $210.6 million in goodwill. (CC ¶ 29). It also provided a fiscal year 2017 guidance of "[t]otal comparable sales growth of flat to low single digit negative," with "[f]ully diluted earnings per share in the range of $1.95-2.20." (CC ¶ 29). The release quoted defendant Watts, who stated that Vitamin Shoppe's "reinvention strategy," "growth initiatives," "accelerated progress in our cost reduction and margin enhancement initiatives," and "long-term prospects for sustainable, profitable growth" supported this guidance. (CC ¶ 29).

### B. March 1, 2017 Conference Call

Vitamin Shoppe held a conference call for analysts and investors on the same day as the March 1, 2017 press release. (CC ¶ 30). Defendants spoke positively about the ongoing "reinvention strategy" and the company's businesses and prospects. (CC ¶ 30). Defendant Watts promised a "more in-depth update on the progress we made on our company reinvention strategy, giving some early indications of what we expect to see on key

3

initiatives for 2017." (CC ¶ 30). He also stated that cost savings and improved margin opportunities "will begin to be reflected in our profit performance later in 2017" and that, because of the reinvention strategy, "our company is well positioned to grow profitably and to increase shareholder value by the back-half of 2017." (CC ¶ 30). Defendant Galgano stated, in pertinent part, that Vitamin Shoppe expected an approximately $17 million year-over-year increase in cost reduction, longer-term growth opportunities, and continued progress on company initiatives. (CC ¶ 31).

### C. March 1, 2017 Form 10-K

On March 1, 2017, Vitamin Shoppe filed its Form 10-K with the SEC, which was signed by Markee, Watts, and Galgano, and certified pursuant to the Sarbanes Oxley Act of 2002 by Watts and Galgano. (CC ¶ 32). The 2016 10-K stated that the company's audited financial statements had been prepared in accordance with GAAP and that the company possessed more than $210.6 million in goodwill. (CC ¶ 32). The form stated that Vitamin Shoppe operated three business segments (i.e., retail, direct, and manufacturing) and that the company had allocated $165.3 million and $45.3 million of its recorded goodwill to the retail and direct segments, respectively. (CC ¶ 32). The form recorded its process for evaluating goodwill. (CC ¶ 32).

Plaintiff alleges that the actions of March 1, 2017 caused Vitamin Shoppe's stock to rise more than 8% from its close of $21.30 on February 28, 2017 in intraday trading, reaching a Class Period high of $23.25 per share on March 1, 2017. (CC ¶ 33). Several Vitamin Shoppe senior executives and directors sold approximately $2.4 million of their personally held stock at this peak time. (CC ¶ 34). Defendant Markee sold 100,000 shares on March 3, 2017 alone, for $2,224,000 in gross proceeds. (CC ¶ 34).

### D. May 10, 2017 Press Release

On May 10, 2017, Vitamin Shoppe announced its first quarter financial results for 2017. (CC ¶ 35). Vitamin Shoppe reported "GAAP fully diluted earnings per share of $0.35" for the first quarter. (CC ¶ 35). The company also

reduced its fiscal year 2017 guidance by more than 45% to "GAAP fully diluted earnings per share in the range of $1.03-$1.28." (CC ¶ 35). The release stated that the company had more than $210.6 million in goodwill as of April 2017. (CC ¶ 35). Defendant Watts was quoted in the release, stating that "[w]hile the start of the year ha[d] been challenging, I am encouraged by the progress we have made on our major reinvention and cost reduction initiatives that we began developing and piloting over the last several months," and that "[c]ustomer response to our pilots has given us confidence that these new initiatives should have a positive impact on our business trends starting in the back half of this year." (CC ¶ 35).

### E. May 10, 2017 Conference Call

Vitamin Shoppe held a conference call on May 10, 2017. (CC ¶ 36). Defendant Watts acknowledged that Vitamin Shoppe was "disappointed" by its first quarter results and that the second quarter was "shaping up to be another difficult quarter." (CC ¶ 36). Nonetheless, he reassured investors that the company had fully "adjusted [its] guidance to reflect this." (CC ¶ 36). Defendant Galgano also assured investors that Vitamin Shoppe was returning to profitability. (CC ¶ 36). She also provided specific second quarter 2017 guidance, stating in pertinent part, "We currently estimate that the second quarter GAAP EPS will be in the range of a loss of $0.07 to earnings of $0.03 a share." (CC ¶ 37).

The price of Vitamin Shoppe shares declined by about one-third on May 10, 2017. (CC ¶ 38). The share price decreased by more than $6 to close at $12.70 per share. (CC ¶ 38). Plaintiffs allege that this reduction occurred in response to the unexpected 45% reduction in fiscal year 2017 earnings guidance. (CC ¶ 38).

### F. May 10, 2017 Form 10-Q

On May 10, 2017, Vitamin Shoppe filed with the SEC its Form 10-Q, which was signed and certified pursuant to the Sarbanes Oxley Act of 2002 by defendants Watts and Galgano. This form stated that the company still had

more than $210.6 million in goodwill on the books as of April 1, 2017, but now stated that all "210.6 million of its recorded goodwill" was being "allocated" to the retail segment. (CC ¶ 39). This added more than $45 million in goodwill to the retail segment. (CC ¶ 39). The Form 10-Q stated that the "interim financial statements reflect all adjustments, which [were], in the opinion of management, necessary for a fair presentation in conformity with GAAP" and that they "should be read in conjunction with the audited financial statements and notes thereto included in the Form 10-K for the fiscal year ended December 31, 2016, as filed with the Securities and Exchange Commission on March 1, 2017." (CC ¶ 39).

### G. August 9, 2017 Announcement

On August 9, 2017, Vitamin Shoppe announced that it was taking a $168.1 million impairment charge on the goodwill associated with its retail segment. (CC ¶ 41). Vitamin Shoppe would thus report a "GAAP loss per share of $6.73" in the second quarter of 2017. (CC ¶ 41). Vitamin Shoppe also dropped its fiscal year 2017 guidance altogether, citing "the potential increase in variability of the Company's results due to the number of initiatives being launched in the back half of the year." (CC ¶ 41).

Vitamin Shoppe's common stock price again decreased. (CC ¶ 42). It fell $3.50 per share to close at $6.10 per share. (CC ¶ 42). Plaintiffs claim that Vitamin Shoppe's common stock was traded on an open, well-developed, and efficient market at all times during the Class Period. (CC ¶ 42).

### H. Causes of Action

Plaintiffs allege that defendants made several materially false and misleading statements during the Class Period. (CC ¶ 40). Specifically, plaintiffs allege that the company's retail segment was continuing to dramatically decline and the "reinvention strategy" was not successful; the ongoing changes from the "reinvention strategy" had significantly impaired the more than $168 million in goodwill being carried on Vitamin Shoppe's retail segment; Vitamin Shoppe improperly delayed in recognizing the impairment to

6

the retail segment's goodwill; Vitamin Shoppe's financial statements were not prepared in conformity with GAAP; the value of the retail segment's goodwill did not increase by more than $45 million during the first quarter of 2017; and that defendants thus lacked a reasonable basis for their positive statements about the success of Vitamin Shoppe's reinvention plan and financial prospects. (CC ¶ 40). Defendants also allegedly did not have a reasonable basis to claim that Vitamin Shoppe would return to profitability during fiscal year 2017. (CC ¶ 40).

Plaintiffs allege that defendants acted with scienter. (CC ¶ 47). Furthermore, plaintiffs claim that defendants are not entitled to the protection of the statutory safe harbor for "forward-looking statements." (CC ¶ 50). They claim that defendants' actions perpetrated a fraud on the market and that the plaintiffs should be joined in a class. (CC ¶¶ 48, 51-56).

Count I alleges violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. (CC ¶¶ 57-61). Count II alleges violation of Section 20(a) of the Exchange Act. (CC ¶¶ 62-63). Plaintiffs seek compensatory damages, including interest; reasonable costs and expenses incurred in the action, including counsel fees and expert fees; and any other appropriate relief.

Now before the court are the competing motions of the SOK plaintiffs and CCFRS. (ECF Nos. 4, 5). Each seeks appointment as lead plaintiff and approval of its selection of counsel as lead counsel. (ECF Nos. 4, 5).

## II.    LEGAL STANDARD

The PSLRA governs the appointment of the lead plaintiff in "each private action arising under the [Exchange Act] that is brought as a plaintiff class action pursuant to the Federal Rules of Civil Procedure." 15 U.S.C. § 78u-4(a)(1). The PSLRA directs courts to adopt a rebuttable presumption that "the most adequate plaintiff is the person or group of persons that has (1) either filed the complaint or made a motion in response to the notice to the class; (2) has the largest financial interest in the relief sought by the class; and (3) otherwise satisfies the requirements of Federal Rule of Civil Procedure 23."

*Lewis v. Lipocine Inc.*, No. 16-cv-4009-BRM-LHG, 2016 WL 7042075, at *4 (D.N.J. Dec. 2, 2016) (citing *Fields v. Biomatrix, Inc.*, 198 F.R.D. 451, 456 (D.N.J. 2000) and 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)).

At this stage, in the context of the PSLRA, Rule 23 requires that the party or parties seeking to represent a class (1) have claims or defenses that are typical of the claims or defenses of the class, (the "typicality requirement") and (2) be able to fairly and adequately protect the interests of the class, (the "adequacy requirement"). *See* Fed. R. Civ. P. 23(a); *In re Cendant Corp. Litig.*, 264 F.3d 201, 263 (3d Cir. 2001); *Lewis*, 2016 WL 7042075, at *4. A more thorough analysis, of course, will occur at the class certification stage.

"Once a presumptive lead plaintiff is located, the court should then turn to the question [of] whether the presumption has been rebutted." *In re Cendant*, 264 F.3d at 268. The presumption "may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—(aa) will not fairly and adequately protect the interests of the class; or (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class." 15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also In re Cendant*, 264 F.3d at 268 ("[T]he question is *not* whether another movant might do a better job of protecting the interests of the class than the presumptive lead plaintiff; instead, the question is whether anyone can prove that the presumptive lead plaintiff will not do a 'fair[] and adequate[]' job." (citation omitted)).

Thus, one way a movant may rebut the presumption is with "proof that the presumptively most adequate plaintiff is 'subject to unique defenses that render such plaintiff incapable of adequately representing the class.'" *Grodko v. Cent. European Distribution Corp.*, No. 12-cv-5530, 2012 WL 6595931, at *3 (D.N.J. Dec. 17, 2012) (quoting 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II)(bb)). As the United States Court of Appeals for the Third Circuit has recognized, "the challenge presented by a defense unique to a class representative [is that] the representative's interests might not be aligned with those of the class, and the

representative might devote time and effort to the defense at the expense of issues that are common and controlling for the class." *Beck v. Maximus, Inc.,* 457 F.3d 291, 297 (3d Cir. 2006). "A proposed class representative is neither typical nor adequate if the representative is subject to a unique defense that is likely to become a major focus of the litigation." *Id.* at 301; *see also Grodko,* 2012 WL 6595931, at *3.

Judge Arleo of the District of New Jersey has usefully explained that the proof required to rebut the presumption at this early stage of litigation "need not definitively establish" the allegedly unique defense; "Rather, the competing plaintiff must show simply that there is some degree of probability that the defense might 'become a major focus' in the case." *In re Enzymotec Ltd. Sec. Litig.,* No. 14-cv-5556, 2015 WL 918535, at *2 (D.N.J. Mar. 3, 2015) (quoting *Steamfitters Local 449 Pension Fund v. Cent. European Distribution Corp.,* Nos. 11-6247, 11-7085, 2012 WL 3638629, at *9 (D.N.J. Aug.22, 2012)); *cf. Roofers' Pension Fund v. Papa,* No. 16-cv-2805, 2017 WL 1536222, at *4 (D.N.J. Apr. 27, 2017) (explaining that movants seeking to rebut the presumption "do[] not have to prove the defense, but [t]he[y] must provide enough evidence to show that it is not speculative or meritless").

## III.   DISCUSSION

As stated above, the PSLRA directs courts to adopt a rebuttable presumption that "the most adequate plaintiff is the person or group of persons that has" **(A)** "either filed the complaint or made a motion in response to the notice to the class"; **(B)** "has the largest financial interest in the relief sought by the class;" and **(C)** "otherwise satisfies the requirements of Federal Rule of Civil Procedure 23." *Lewis v. Lipocine Inc.,* No. 16-cv-4009, 2016 WL 7042075, at *4 (D.N.J. Dec. 2, 2016) (citing 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I); *Fields v. Biomatrix, Inc.,* 198 F.R.D. 451, 456 (D.N.J. 2000)). Considering both the SOK plaintiffs and CCFRS in light of elements A, B, and C, I conclude that the SOK plaintiffs are presumptively the most adequate plaintiffs. Following that analysis, I then

**(D)** evaluate whether CCFRS can rebut that presumption and **(E)** determine the appointment of lead counsel.

### A. Timely Motion in Response to Notice of the Class

The SOK plaintiffs and CCFRS have both submitted timely motions to be appointed as lead plaintiff. (SOK Motion; CCFRS Motion). The PSLRA provides that once a complaint is filed, the pendency of the action must be publicized in a widely circulated national business-oriented publication or wire service within 20 days. 15 U.S.C. § 78u-4(a)(3)(A)(i). The notice shall advise members of: (1) the pendency of the action; (2) the claims asserted therein; (3) the purported class period; and (4) the right to move the court to be appointed as lead plaintiff within 60 days of notice. *Id.* In this case, adequate notice was published through *Business Wire* on August 28, 2017. (ECF No. 4-1, ex. A). The SOK plaintiffs and CCFRS filed their motions on October 27, 2017. (SOK Motion; CCFRS Motion). Both of these motions were filed within the 60-day deadline after publication and both therefore meet this first requirement.

### B. Largest Financial Interest

The SOK plaintiffs and CCFRS disagree as to which party has the larger financial interest in the relief sought by the class. Together, the SOK plaintiffs claim an $86,454 loss. (SOK Motion at 5; CCFRS Motion at 1-2). Schubert has a $54,748 loss; Onishuk an $18,616 loss; and Kayyal a $13,089 loss. (SOK Motion at 5; CCFRS Motion at 1-2). CCFRS reports a $27,990 loss.[2] (SOK Motion at 5; CCFRS Motion at 1-2). I rank the losses, aggregate and individual, by size in table format:

| Movant(s) | Claimed Loss |
|---|---|
| **Schubert, Onishuk, & Kayyal Total** | **$86,454** |
| Schubert | $54,748 |
| Onishuk and Kayyal Total | $31,705 |

---

[2]     The parties agree on these losses. The SOK plaintiffs include cents in their figures; CCFRS does not. The losses of Schubert, Onishuk, and Kayyal do not add up to exactly $86,454 because of rounding.

| CCFRS | $27,990 |
|---|---|
| Onishuk | $18,616 |
| Kayyal | $13,089 |

(SOK Motion at 5; CCFRS Motion at 1-2).

If the three SOK plaintiffs' claimed losses are aggregated, the SOK plaintiffs clearly have the larger financial interest. CCFRS argues, however, that the SOK plaintiffs' losses cannot be aggregated because: **(i)** Schubert has not proven that he has a direct financial stake in the loss and thus lacks standing; and **(ii)** the SOK plaintiffs are an unrelated group of individuals. I note, however, that Schubert's loss, standing alone, is larger than that of CCFRS, and that Onishuk and Kayyal's interests, if aggregated, would still be larger than CCFRS's interest. To establish that its loss is the largest, then, CCFRS must establish *both* that Schubert is disqualified *and* that the losses of Onishuk and Kayyal cannot be aggregated.

### i. Schubert's Standing[3]

Plaintiff Schubert did not purchase Vitamin Shoppe stock, the security that is the subject of this action. (ECF No. 4-2). Catherine Prehn purchased the stock and Schubert holds Prehn's power of attorney. (ECF No. 4-2). In a supplemental filing submitted after the 60-day deadline, Schubert claims that Catherine Prehn is his elderly grandmother who assigned him the right and ability to pursue these legal claims. (ECF No. 9-2). Schubert reports that Catherine Prehn assigned her Vitamin Shoppe stock to Schubert during the Class Period. (ECF No. 4-2). He filed this exhibit on October 27, 2017—i.e., after the 60-day post-notice deadline.

Those circumstances suggest raises three issues: **(1)** whether the power of attorney provides Schubert with standing; **(2)** whether the assignment provides Schubert with standing; and, if so, **(3)** whether the evidence of the

---

[3]     Whether Schubert has standing relates whether his claims can be aggregated with Onishuk and Kayyal's interests, and also whether Schubert has unique legal issues that would prevent him from satisfying the Rule 23 requirements.

11

assignment, submitted after the 60-day deadline, should be considered by this court.

### 1. Power of Attorney and Standing

Schubert's power of attorney does not provide Schubert with standing to sue. Article III standing consists of three "irreducible" elements: (1) injury-in-fact, which is a "concrete and particularized" harm to a "legally protected interest"; (2) causation in the form of a "fairly traceable" connection between the asserted injury-in-fact and the alleged actions of the defendant; and (3) redressability, or a non-speculative likelihood that the injury can be remedied by the requested relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). These requirements ensure that a plaintiff has a sufficiently personal stake in the outcome of the suit so that the parties are adverse. *Cf. Baker v. Carr*, 369 U.S. 186, 204 (1962) ("Have [plaintiffs] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions?"). To satisfy the injury-in-fact requirement, "the injury must affect the plaintiff in a personal and individual way." *See Lujan*, 504 U.S. at 560 n.1.

In this context, a power of attorney does not endow the attorney-in-fact with injury-in-fact. The Second Circuit has found that an investment advisor with the power of attorney—but not an ownership stake in the claims—does not have standing to pursue federal securities claims. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 108-10 (2d Cir. 2008). The person with power of attorney is empowered to act on behalf of a principal, but does not personally suffer any drop in value of the securities owned by the principal.

District courts in the Third Circuit once allowed "investment advisors" to bring suit on behalf of their clients. *See, e.g., Marden v. Select Medical Corp.*, 246 F.R.D. 480 (E.D. Pa. 2007). But more recent case law has challenged the premise that an individual without legal title to the claim has suffered an

injury-in-fact in the context of a federal securities litigation. In 2008 the Supreme Court held that an assignee has legal standing because it possesses legal title to the claim, and therefore has legal title to, and has suffered, the injury-in-fact that occurred. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269 (2008). After *Sprint*, the Second Circuit held that an investment advisor, who has authority to make investment decisions and a power of attorney, does not have standing to bring securities lawsuits when he or she does not own the underlying securities. *W.R. Huff Asset Mgmt. Co., LLC v. Deloitte & Touche LLP*, 549 F.3d 100, 103 (2d Cir. 2008). "Sprint makes clear that the minimum requirement for an injury-in-fact is that the plaintiff have legal title to, or a proprietary interest in, the claim." *Id.* at 108. The Second Circuit continued:

> [A] mere power-of-attorney ... does not confer standing to sue in the holder's own right because a power-of-attorney does not transfer an ownership interest in the claim. By contrast, an assignment of claims transfers legal title or ownership of those claims and thus fulfills the constitutional requirement of an injury-in-fact.

*Id.*; *see also Steamfitters Local 449 Pension Fund v. Cent. European Distrib. Corp.*, Nos. 11-cv-6247, 11-cv-7085, 2012 WL 3638629, at *10 (D.N.J. Aug. 22, 2012).

Second Circuit decisions do not bind district courts in the Third Circuit. Nonetheless, Judges of the Eastern District of Pennsylvania and the District of New Jersey have been persuaded by *Sprint* and *Huff* that plaintiffs must have some type of proprietary interest in the claim they are litigating. *See, e.g., Steamfitters Local 449 Pension Fund*, 2012 WL 3638629, at *10; *In re Herley Indus. Sec. Litig.*, No. 6-cv-2596, 2009 WL 3169888 (E.D. Pa. Sept. 30, 2009). I am likewise persuaded, and join them in holding that a power of attorney, in itself, does not grant standing in federal securities cases.

There are prudential exceptions to the injury-in-fact requirement if a plaintiff can demonstrate (1) a "close relationship" to the injured party and (2) a

13

barrier to the injury party's ability to assert its own interest. *Huff*, 549 F.3d at 109 (citing *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004)). Courts have found a "close relationship" between trustees and their trusts, guardians ad litem and their wards, receivers and their receiverships, assignees in bankruptcy and the bankrupt estates, and foster parents and their foster children. *Id.*; *see also Sprint*, 554 U.S. at 287-88; *Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 841 n.44 (1977). Schubert argues that he satisfies this prudential exception. Schubert argues that (1) he has a close relationship to Catherine Prehn as her grandson and (2) there is a barrier to Catherine Prehn's involvement given her age and preference not to be involved in the litigation. (ECF No. 9, at 7). Schubert's family relationship with Prehn, however loving and affectionate, is not typical of those found to be "close" for purposes of the exception to prudential standing; those "close relationships" tend to be legally created bonds. Schubert has not cited precedent that a grandmother-grandson relationship qualifies. Nor has Schubert demonstrated that Catherine Prehn is disabled from litigating this claim; he merely states that his grandmother is older and does not wish to be involved.

### 2. Assignment

Nonetheless, there is evidence that Catherine Prehn assigned her Vitamin Shoppe stock to Schubert during the Class Period. (ECF No. 4-2). The Supreme Court has held that an assignee who holds legal title to an injury party has standing to pursue that claim—even if the assignee has agreed to remit all proceeds from the litigation back to the assignor. *Sprint*, 554 U.S. at 285-86. The Second Circuit applied this principle in *Huff.* 549 F.3d at 108-09. The assignment of stock to Schubert therefore would provide Schubert with standing. I have to consider, however, whether the court will accept the belatedly-submitted evidence of that assignment.

### 3. Post-Deadline Submissions

Schubert was assigned the stock during the Class Period and thus had an injury when the litigation commenced. (ECF No. 4-2). Evidence of the

14

assignment to Schubert, however, was submitted after the 60-day post-notice deadline. Nevertheless, Courts have permitted supplemental evidence after the 60-day deadline in an appropriate case. *See, e.g.*, *In re Merck & Co., Inc. v. Sec., Derivative & ERISA Litig.*, MLD No. 1658 (SRC), 2015 WL 3823912, at *5 (D.N.J. June 19, 2015) (permitting parties to file amended complaints, after the 60-day PSLRA deadline, to "assert facts that make their standing to bring suit clear based on the assignments given by the beneficial owners of the [defendant's] stock at issue"); *In re Vivendi Universal, S.A. Sec. Litig.*, 605 F. Supp. 2d 570, 586 (S.D.N.Y. Mar. 31, 2009) (permitting plaintiffs, after the 60-day deadline, to amend their complaints to allege assignment, ratification, or substitution by entities with standing to bring suit in a PSLRA action).

Defendants cite a Tenth Circuit case for the proposition that a movant for lead plaintiff status in a PSLRA action must demonstrate its financial interest within the 60-day deadline. *See In re Bard Assocs., Inc.*, No. 9-6243, 2009 WL 4350780, at *3 (10th Cir. Dec. 2, 2009). In *Bard*, the district court held that a movant must establish Article III standing by the time the motions to appoint a lead plaintiff are due. *Id.* The Tenth Circuit was hesitant to accept this finding. *Id.* Nonetheless, the court of appeals declined to hold that the district court "acted wholly without jurisdiction or so clearly abused its discretion as to constitute usurpation of power." *Id.* (citation omitted). Therefore, the Tenth Circuit did not itself adopt an inflexible deadline; it merely held that a district court could do so.

Seeing no prejudice, I will exercise some flexibility. Like the Southern District of New York and District of New Jersey Judges, I will permit Schubert's post-deadline evidence showing the assignment of stock. Schubert therefore has established his standing to pursue PSLRA claims against defendants. Even standing alone, Schubert has the greatest financial claim of any party that has sought to be appointed lead plaintiff. In the next section, I will consider whether Schubert's losses can be aggregated with those of Onishuk and Kayyal.

### ii. Aggregation of Unrelated Persons

The text of the PSLRA permits the appointment of a "person or group of persons" to be the plead plaintiff. 15 U.S.C. § 74u-4(a)(3)(B)(iii)(I); *see In re Gentiva Sec. Litig.*, 281 F.R.D. 108, 118-19 (E.D.N.Y. 2012) ("[I]t is clear that the express language of the PSLRA permits the appointment of a person *or group of persons* to be lead plaintiff."). The group of persons does not need to be "related" in some manner; but any such group must be able to "fairly and adequately protect the interests of the class." *In re Cendant Corp. Litig.*, 264 F.3d 201, 266-67 (3d Cir. 2001). I analyze whether this group can fairly and adequately represent the class in connection with the Rule 23 requirements.

### C. Rule 23 Requirements

There are four requirements for class certification under Rule 23(a): the class must be "so numerous that joinder of all members is impracticable," "there are questions of law or fact common to the class," "the claims and defenses of the representative parties are typical of the claims or defenses of the class," and "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). These four requirements are frequently referred to as numerosity, commonality, typicality, and representation.

"[O]f the four requirements for class certification under Rule 23(a), only two—typicality and adequacy of representation—directly address whether a lead plaintiff movant is the 'most adequate plaintiff.'" *Chao Sun v. Han*, No. 15-cv-703, 2015 WL 2364937, at *3 (D.N.J. May 14, 2015) (citation omitted). At this stage of the litigation, the parties need only make a *prima facie* showing of typicality and adequacy; the analysis is less rigorous than at the class certification stage. *See In re Cendant*, 264 F.3d at 263.

### i. Typicality

The SOK plaintiffs' claims are typical of the class. As explained by Chief Judge Linares in *Chao Sun*:

> A proposed lead plaintiff's claims are typical of the class when the proposed lead plaintiff's claims and injuries arise from the same event or course of conduct that gave rise to the claims of the other class members and are premised on the same legal theory. *In re Party City Sec. Litig.*, 189 F.R.D. 91, 107 n.13 (D.N.J. 1999). The Rule 23(a)(3) typicality requirement "is to ensure that 'maintenance of a class action is economical and that the named plaintiff's claims and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Cromer Fin. Ltd. v. Berger*, 205 F.R.D. 113, 122 (S.D.N.Y. 2001) (quoting *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)).

*Chao Sun*, 2015 WL 2364937, at *5. Here, the SOK plaintiffs' claims arise from the same event, practice or conduct that gives rise to the other class members' claims; their claims are based on the same legal theory. The SOK plaintiffs allege that defendants made material misstatements and omissions concerning Vitamin Shoppe, in violation of federal securities laws. They allegedly purchased Vitamin Shoppe securities on reliance of these purported misstatements and omissions—and were allegedly damaged thereby.

### ii. Adequacy of Representation

The SOK plaintiffs have also shown that they will adequately represent the class. As stated in *Chao Sun*:

> Rule 23(a)(4)'s requirement of "[a]dequacy, for purposes of the lead plaintiff determination, is contingent upon both the existence of common interests between the proposed lead plaintiffs and the class, and a willingness on the part of the proposed lead plaintiff to vigorously prosecute the action." *In re Nice Sys. Sec. Litig.*, 188 F.R.D. 206, 219 (D.N.J. 1999). "The Third Circuit explained that when assessing the adequacy of representation, courts should consider whether the proposed lead plaintiff has the ability and incentive to represent the claims of the class vigorously, [whether it] has obtained adequate counsel, and [whether] there is [a] conflict between [the movant's] claims and those asserted on behalf

of the class." *Id.* (quoting *In re Cendant Corp.*, 264 F.3d at 265) (internal citation omitted).

*Chao Sun*, 2015 WL 2364937, at *3 (bracketed material in original). The SOK plaintiff have selected counsel with experience in securities litigation. *See* (ECF Nos. 4-4, 4-5, 4-6). There are no known conflicts between the SOK plaintiffs and the members of the class, and the lead plaintiffs appear to have a sufficient interest in the outcome of the case to ensure vigorous advocacy.

### D. Rebuttable Presumption

The SOK plaintiffs thus entitled to the presumption that they are the most adequate plaintiffs. They made a timely motion, have the largest financial interest in the relief sought by the class, and satisfy the typicality and adequacy prongs of Rule 23. Once a movant is presumptively the most adequate plaintiff, this presumption

> may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>> (aa) will not fairly and adequately protect the interests of the class; or
>> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 74u-4a(3)(B)(iii)(II). In accordance with the statute, the burden falls on CCFRS to support these two rebuttal factors with proof.

### i. Fairly and Adequately Represent Class Interests

To evaluate whether the movant will "fairly and adequately" represent the class's interests, courts may consider: **(a)** the sophistication of the plaintiffs, **(b)** the qualifications of their counsel, **(c)** whether the group was created by the efforts of lawyers for the purpose of obtaining lead plaintiff status, and **(d)** whether the group is too large to adequately represent the class. *In re Cendant*, 264 F.3d at 266-69.

**(a)** CCFRS has not provided any proof that the SOK plaintiffs are not sophisticated. **(b)** CCFRS has questioned why the SOK plaintiffs seek to

appoint two law firms as co-lead counsel, but they have not produced evidence that these law firms are not qualified to represent the putative class.[4]

(c) While unrelated groups may be considered together as plaintiffs under the PSLRA, there are circumstances where such groups may not be appropriate:

> If, for example, a court were to determine that the movant "group" with the largest losses had been created by the efforts of lawyers hoping to ensure their eventual appointment as lead counsel, it could well conclude, based on this history, that the members of that "group" could not be counted on to monitor counsel in a sufficient manner. *See, e.g., In re Razorfish, Inc. Sec. Litig.*, 143 F. Supp. 2d 304, 307-08 (S.D.N.Y. 2001) (refusing to appoint as lead plaintiff a group that, in the court's view, was "simply an artifice cobbled together by cooperating counsel for the obvious purpose of creating a large enough grouping of investors to qualify as 'lead plaintiff,' which can then select the equally artificial grouping of counsel as 'lead counsel'").

*In re Cendant*, 264 F.3d at 267. "Allowing unrelated plaintiffs to band together in order to manufacture a larger financial interest" does not further the goals of the PSLRA. *In re Petrobras Sec. Litig.*, 104 F. Supp. 3d 618, 621-22 (S.D.N.Y. 2015). Congress intended that the lead plaintiff be appointed on the basis of financial interest to ensure that investors, not lawyers, take charge of the litigation. *Id.; see also Soto v. Hensler*, 235 F. Supp. 3d 607, 620-21 (D. Del. 2017). Moreover, the aggregation of unrelated plaintiffs can create problems of coordination, risks duplication of effort, and reduces the incentive of each individual plaintiff in carrying out duties. *See In re Petrobras Sec. Litig.*, 104 F. Supp. 3d at 621-22.

Nonetheless, there is insufficient evidence that Schubert, Onishuk, and Kayyal have been "cobbled together" in the manner discussed in the cases above. In a joint declaration submitted to the court, the SOK plaintiffs explain that they discussed a joint motion for appointment before the motion was filed

---

[4]     Whether two law firms should be appointed co-lead counsel will be addressed in subsection III.E, *infra*.

on their behalf; they discussed the respective responsibilities of counsel and lead plaintiff; established protocol for maintaining regular contact with each other and with counsel; incorporated a method of decision-making during the course of litigation; and have each other's contact information so the lead plaintiffs can communicate without counsel. (ECF No. 6-1). The SOK plaintiffs attested to their capabilities in participating in the action, committed themselves to the zealous prosecution of the case and active involvement, and agreed to monitor the litigation's progress. (ECF No. 6-1).

Other courts have relied on similar declarations to find that proposed groups will be able to function as lead plaintiffs—particularly if the proposed lead plaintiffs provided some details on how they will coordinate their efforts. *See, e.g.*, *Soto v. Hensler*, 235 F. Supp. 3d 607, 621-22 (D. Del. 2017); *In re Enzymotec Ltd. Sec. Litig.*, No. 14-cv-5556, 2015 WL 918535, at *4 (D.N.J. Mar. 3, 2015); *Cook v. Atossa Genetics, Inc.*, No. C13-1836, 2014 WL 585870, at *6 (W.D. Wash. Feb. 14, 2014); *In re Molycorp, Inc. Secs. Litig.*, No. 12-cv-292, 2012 U.S. Dist. LEXIS 89191, at *8-9 (D. Colo. May 29, 2012); *In re Bank of Am. Corp.*, No. MDL 09-02014, 2009 WL 2710413, at *3 (N.D. Cal. Aug. 26, 2009); *In re Nature's Sunshine Prods., Inc. Sec. Litig.*, No. 2:06-cv-267, 2006 WL 2380965, at *1 (D. Utah Aug. 16, 2006).

Additionally, even if the SOK plaintiffs were not considered as a group, Schubert's financial loss, standing alone, is greater than CCFRS's loss. Schubert reports a $54,748 loss, while CCFRS reports a $27,990 loss. This eases concerns about plaintiffs coming together solely to aggregate losses; the fact that Schubert would have been the shareholder with the largest financial loss regardless of Onishuk and Kayyal's participation suggest that other considerations (beyond merely demonstrating the largest loss) motivate the SOK plaintiffs. *See Soto v. Hensler*, 235 F. Supp. 3d 607, 621-22 (D. Del. 2017).

**(d)** Courts must inquire whether a movant group is too large to represent the class adequately. At some point, a group may become too large for its members to operate effectively as a unit. *See In re Cendant*, 264 F.3d at 267.

Such unwieldiness would vitiate the PSLRA's purpose of having active and engaged plaintiffs supervise the conduct of the litigation. *Id.* "[T]he larger [the size of a proposed lead plaintiff group], the greater the dilution of control that [the members of that group] can maintain over the conduct of the putative class action." *Chill v. Green Tree Fin. Corp.*, 181 F.R.D. 398, 408-09 (D. Minn. 1998) (internal quotation marks and citations omitted)). In *Chill v. Green*, for instance, a court declined to confer presumptive lead status upon a "group" with almost 300 members, because doing so "would threaten the interests of the class, would subvert the intent of Congress, and would be too unwieldly to allow for the just, speedy and inexpensive determination of this action." *Id.* at 408.

The Third Circuit has not established a hard-and-fast rule; thus the "rule of reason prevails." *In re Cendant*, 264 F.3d at 267. There are indications that the Third Circuit generally presumes that groups with more than five members are too large to work effectively. *Id.* This group of three, however, is too small to raise such concerns.

### ii. Unique Defenses

CCFRS claims that Schubert is subject to a unique defense. CCFRS argues that Schubert does not have standing to pursue these claims. I addressed this in subsection III.B.i. Schubert has standing. CCFRS has not provided any further evidence of unique defenses regarding the SOK plaintiffs.

These three SOK plaintiffs established the rebuttable presumption that they are the most adequate lead plaintiff. CCFRS failed to provide sufficient evidence to rebut this presumption. Richard Schubert, Daniel E. Onishuk, Jr., and Mohammed Kayyal are therefore appointed co-lead plaintiffs.

### E. Appointment of Legal Counsel

The PSLRA vests authority in the lead plaintiff to select and retain counsel, subject to the approval of the court. *See* 15 U.S.C. § 78u-4(a)(3)(B)(v). The court will not disturb the plaintiffs' choice of counsel unless it is "necessary to protect the interests of the class." *See In re Cendant*, 264 F.3d at

273. The court should generally employ a deferential standard in reviewing the lead plaintiff's choices for counsel. *See id.* at 274; *see also Topping v. Deloitte Touche Tohmatsu CPA*, 95 F. Supp. 3d 607, 623 (S.D.N.Y. 2015) ("There is a strong presumption in favor of approving a properly-selected lead plaintiff's decision as to counsel.").

The SOK plaintiffs have selected Glancy Prongay & Murray LLP and Scott+Scott, Attorneys at Law, LLP as lead counsel, and Schnader Harrison Segal & Lewis LLP as liaison counsel, for the class. Some courts have expressed concern that the appointment of multiple law firms is not necessary for effective representation. *See, e.g., Arciaga v. Barrett Bus. Servs., Inc.*, Nos. C14-5584, C14-5903, C14-5912, 2015 WL 791768, at *2 (W.D. Wash. Feb. 25, 2015) (finding, among other issues, that the appointment of two law firms to be co-lead counsel "raises the concern that the [plaintiffs'] group is less likely to be in control of the litigation"); *In re Reliant Sec. Litig.*, No. 2-2292, 2002 U.S. Dist. LEXIS 27777, at *10-16 (S.D. Tex. Aug. 27, 2002) (finding that the appointment of co-lead counsel is "not necessary for the effective representation of the proposed class"). Other courts have permitted plaintiffs to appoint co-lead counsel. *See, e.g., Chao Sun v. Han*, No. 15-cv-703, 2015 WL 2364937, at *5 (D.N.J. May 14, 2015) (permitting co-lead counsel); *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 479 (S.D.N.Y. 2011) (same); *Sgalambo v. McKenzie*, 268 F.R.D. 170, 177 (S.D.N.Y. 2010) (same).[5]

The court's role is generally limited to "'approv[ing] or disapprov[ing] lead plaintiff's choice of counsel;' and … it is not the court's responsibility to make that choice itself." *In re Cendant*, 264 F.3d at 274. "[T]he question is whether judicial intervention is 'necessary to protect the interests of the plaintiff class.'" *Id.* "[T]he question is not whether the court believes that the lead plaintiff could have made a better choice or gotten a better deal." *Id.* at 276. Plaintiffs have chosen firms with significant securities litigation experience. *See* (ECF No. 4-4,

---

5    In fact, Carella, Byrne, Cecchi, Olstein, Brody & Agnello, P.C.—counsel for CCFRS—has served as co-lead counsel in similar securities litigation. *See, e.g., Chao Sun v. Han*, No. 15-cv-703, 2015 WL 2364937, at *5 (D.N.J. May 14, 2015).

4-5, 4-6). The appointment of co-lead counsel may not be ideal, but my concerns at this stage are not so severe as to overcome the general principal of deference to plaintiffs' choice of counsel. It is unnecessary for the court to intervene to protect the interests of the plaintiff class. Whether, if and when the time comes, the Court will approve fees it regards as unnecessary or redundant is of course another matter.

## IV. CONCLUSION

For the foregoing reasons, the motion of Richard Schubert, Daniel E. Onishuk, Jr., and Mohammed Kayyal to be appointed lead plaintiffs (ECF No. 4) is granted. Their choice of Glancy Prongay & Murray LLP and Scott+Scott, Attorneys at Law, LLP as lead counsel and Schnader Harrison Segal & Lewis LLP as liaison counsel for the class is approved.

The motion of the Corpus Christi Firefighters' Retirement System (ECF No. 5) is denied.

An appropriate order accompanies this opinion.

Dated: April 25, 2018

**KEVIN MCNULTY**
**United States District Judge**